# Exhibit B

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| WHOLE WOMAN'S HEALTH, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | CIVIL ACTION |
| v. | ) | |
| | ) | CASE NO. __1:17-cv-690____ |
| KEN PAXTON, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF PLAINTIFF BHAVIK KUMAR, M.D., M.P.H.

Dr. Kumar declares under penalty of perjury that the following statements are true and correct:

1. I am a board-certified family medicine physician, licensed to practice in the state of Texas. I am the Texas medical director of Whole Woman's Health ("WWH"), which operates four licensed abortion clinics, located in Austin, Fort Worth, McAllen, and San Antonio. My responsibilities as medical director include: supervising medical services at the clinics, including nursing, clinical, and laboratory services; supervising quality assurance by participating in meetings and reviews; participating in the regulatory inspection process; helping recruit providers for the clinics; supervising training programs for physicians and residents; and directing research projects.

2. WWH provides abortion services through 17.6 weeks of pregnancy, as measured from the first day of a woman's last menstrual period ("LMP"). I currently provide abortion services through 17.6 weeks LMP at both our Austin and San Antonio clinics, and I have also

provided abortions at our Fort Worth clinic in the past.  In addition, I train other physicians in the provision of abortion services at our Austin and San Antonio clinics.

3.      I have reviewed the relevant provision of S.B. 8 banning so-called "dismemberment" abortions.  As I will explain, I am concerned that I may no longer be able to provide dilation and evacuation ("D & E") procedures to my patients if S.B. 8 takes effect, and S.B. 8 will impose both physical and emotional burdens on my patients, with no corresponding medical benefit.  Overall, S.B. 8 will harm my patients' health and safety.

4.      The information in this declaration is based on my personal knowledge, and my opinions are based on my education, training, and expertise.

5.      I provide abortion services in both the first trimester and second trimester of pregnancy.  In the first trimester, I provide medication abortions through 10 weeks LMP, and surgical abortions using suction aspiration.  In the second trimester, I provide surgical abortions using suction aspiration and D & E.

6.      Patients who seek abortions in the second trimester do so for a number of reasons.  Primarily, the patients I see in the second trimester have been unable to get care in the first trimester because of certain factors in their lives that make access to care more difficult:  financial hurdles, work schedules, inability to travel to the clinic, and childcare, for example, can all be factors that delay a woman seeking abortion into the second trimester.  For women of color and low-income women, these barriers can be especially severe.  In addition, some of my patients seek second trimester abortions due to fetal anomalies that are not routinely diagnosable until the second trimester.

7.      Another barrier to access to care in Texas, and which pushes women into the second trimester, is the 24-hour mandatory delay law.  Under the law, women who live within 100 miles

of a licensed abortion clinic (around an estimated 80-90% of my patients) must obtain state-mandated counseling at the clinic at least 24 hours before their procedure.  (For patients who live 100 miles or more from a clinic, the mandatory delay is 2 hours.)  While this delay may seem brief, it is a huge barrier for some patients, as it may be a few weeks before a patient is able to get another day off work to return for her procedure.  This mandatory delay thus adds another unnecessary barrier to women seeking abortion in Texas.

8.      Before all surgical abortions, I first dilate the patient's cervix with medications, osmotic dilators, or other instruments to allow the safe passage of instruments to remove the pregnancy.  Depending on the gestational age of the pregnancy, I may wait several hours after initiating dilation to complete the procedure using instruments.  In my current practice, I do not use overnight dilation for my patients because patients prefer same-day dilation, as it is cheaper and more convenient, and overnight dilation is generally not medically necessary for the procedures I perform.

9.      Beginning at approximately 15.0 weeks LMP, and for patients with certain criteria between 14.0 and 15.0 weeks, I use instruments such as forceps along with suction to remove the amniotic fluid, placenta, and fetus.  I begin the evacuation procedure, using primarily suction, and forceps as needed.  Beginning at approximately 15.4 weeks LMP, I routinely use forceps to remove tissue from the uterus.

10.     When I perform a surgical abortion, I do not seek to cause fetal demise before using forceps to remove fetal tissue.  I have not been trained in any methods of inducing fetal demise, including giving injections of medications called digoxin or potassium chloride ("KCl"), and I have never attempted to administer such an injection.  My understanding is that digoxin can be

3

given to the fetus intrafetally or intraamniotically, whereas KCl must be administered by intracardiac injection into the fetus to avoid health risks to the patient.

11.     I am aware that some physicians use digoxin at 18 weeks LMP or later to cause fetal demise.  I have not heard of any doctors routinely using digoxin before 18 weeks LMP, and I have not seen anything in the medical literature about such use.  I am aware that digoxin is associated with unnecessary pain and discomfort for the patient, and that there is some concern that digoxin increases the risk of extramural delivery of the fetus outside the clinic setting.

12.     Even if I were trained to administer digoxin, I would not recommend it for my patients, and I would not provide it unless compelled to do so by law, as it is absolutely medically unnecessary and it imposes significant burdens.  A digoxin injection is an additional procedure my patients do not need, the injection itself can be distressing and/or painful, and there are small but significant medical risks to the procedure.  Thus, it is an additional medical procedure with added risks and no corresponding medical benefits.

13.     Requiring digoxin for my patients would also impose barriers to their ability to access abortion care.  The injection can increase the cost of the procedure and would drastically increase procedure times at WWH.  My understanding is that digoxin can take up to 24 hours to cause demise. Because I perform dilation the same day as the evacuation procedure, administering digoxin would add an additional day to the procedure, and require an additional trip to the clinic, as patients would need to come to the clinic the day before dilation to receive the digoxin injection. Patients would thus need to make a total of (at least) three separate trips to the clinic (first for mandatory counseling, second for the digoxin injection, and third for the procedure itself).  Two of these trips are medically unnecessary and increase the burdens on patients.  The women most affected will include women of color and low income women for whom, as discussed above,

4

barriers to access are already high.  In addition, the emotional burden for victims of intimate partner violence can be higher still, as they are often anxious to get their procedures as soon as possible so they can move on with their lives.

14.     To administer digoxin, I would also need to obtain informed consent from my patients for a procedure that I, as their physician, do not believe is in their best interest and which I understand to be experimental at the gestational ages at which I provide D & E's.  To obtain fully informed consent, I would need to explain that the procedure is legally necessary and I am forced to provide it to avoid criminal liability, but that it is associated with risks that are both known and unknown.  My patients would suffer an additional emotional burden from that informed consent process.  This process would also be contrary to my role as a physician, as my goal is to provide the best level of medicine and the highest standard of care I can to my patients.

15.     I am aware that some physicians perform umbilical cord transection during certain abortion procedures, but it is not the standard of care, and I do not know how often it is successful in causing demise.  I was not trained to perform umbilical cord transection, and I have never attempted it.  Occasionally, I unintentionally grasp the cord while removing other fetal tissue.

16.     Based on my understanding of umbilical cord transection, attempting it on every patient for whom I might need to use forceps to complete a procedure would cause unnecessary risks to the patient including:  increasing the risk of uterine perforation and hemorrhage; extending the procedure time, which could increase the risk of damage to the uterus; and increasing the risk that the patient's sedation medications would wear off during the procedure, necessitating longer sedation, which also increases the risks to the patient.  I do not know if umbilical cord transection is even possible in every case.

17.     I am aware that the Texas chapter of the American Congress of Obstetricians and Gynecologists, or ACOG, opposed the standalone D & E ban bill that was eventually added to S.B. 8.  Their letter in opposition is attached as Exhibit 1.

18.     Induction of labor, the provision of medications to induce labor, is another rarely used method of abortion in the second trimester.  Induction can take several hours to several days, depending on the patient and the pregnancy, is much more costly and involved for the patient than the D & E procedure, and usually requires a hospital stay because it cannot be done in an outpatient setting.  Many Texas hospitals do not allow abortions and are already overwhelmed with patients delivering full term pregnancies.  For these reasons, induction of labor is not a realistic alternative to D & E in Texas.

19.     S.B. 8 makes it illegal for me to provide the D & E procedures I currently perform. The only way to avoid the ban would be to be certain that I can induce fetal demise before beginning a procedure in which I will use forceps to remove fetal tissue.  For many procedures after approximately 14 weeks LMP, I could never be certain of that.  My understanding is that no method of fetal demise is 100% effective at inducing demise.  This law forces me to choose between criminal prosecution and continuing to provide care that is consistent with my duties as a physician and my patients' best interests.

//

Dated this 17th day of July, 2017.

_____

Bhavik Kumar, M.D., M.P.H.

# Exhibit 1



**District XI (Texas)**
**P.O. Box 17143**
**Austin, TX 7415760**
**info@tx.acog.org**

## Texas-ACOG Opposes SB 415 by Senator Perry
February 15, 2017

Dear Chairman Schwertner and Members of the Senate Health and Human Services Committee,

Thank you for the opportunity to present this written testimony in opposition to SB 415. The Texas District of the American Congress of Obstetricians and Gynecologists represents more than 3,700 physicians and partners in women's health. Texas-ACOG opposes SB 415.

While ACOG recognizes that the issue of support for or opposition to abortion is a personal matter and respects the need and responsibility of its members to determine their individual positions, as an organization ACOG recognizes that abortion is an essential health care service and opposes laws regulating medical care that are unsupported by scientific evidence and that are not necessary to achieve an important public health objective.

**Texas-ACOG opposes SB 415 for the following reasons:**

- Prevents physicians from offering the safest medical care possible to patients. A ban singling out a specific procedure, ignores women's health and denies safe care to patients.

- Would take decision-making away from women and their doctors and <u>criminalizes physicians</u> who perform a procedure that in many cases is necessary to protect a woman's health or future fertility.

- Interferes and threatens communications between a patients and her physician or causes a physician to compromise his or her medical judgment about what information or treatment is in the best interest of the patient.

- Criminalizes physicians and puts them in the unconscionable position of having to deny a woman the evidence-based, compassionate care that results in the fewest complications, which would have a chilling effect on the availability of medical care for women in our state.

- **No fetal health exception**: Fetal development is a complex process that can tragically go awry. Birth defects are a leading cause of infant mortality, and in many cases of severe birth defects, no medical treatment can save a baby's life. Under SB 415, no exception would be made for a fetus with a fatal defect.

- **No rape or incest exception**: Under SB 415, an exception would not allow for a certain abortion procedure in the event of rape. This bill imposes harsh restrictions on a woman whose pregnancy resulted from rape and wishes to have an abortion.

- **No mental health exception**: SB 415 provides for a certain abortion procedure only in the case of averting death of the woman or irreversible physical impairment. This fails to recognize mental health as a critical component of health and how mental health issues can lead to death or serious harm.

- SB 415 does not use medical terminology and creates a dangerous environment for patients that would prevent doctors from having every option available when providing a patient with the best possible care in any given situation -- including when necessary to protect a woman's health.

SB 415 is overreaching and would have extreme consequences on women's healthy by preventing physicians from having every option available when providing a patient with the best possible care in any given situation. For the reasons laid out above, we respectfully oppose SB 415.

Respectfully,

C. Tony Dunn, MD, FACOG

Chair, Texas District American Congress of Obstetricians and Gynecologists