# Exhibit C

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| WHOLE WOMAN'S HEALTH, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | CIVIL ACTION |
| v. ) | |
| ) | CASE NO. 1:17-cv-690 |
| KEN PAXTON, et al., ) | |
| ) | |
| Defendants. ) | |

**DECLARATION OF PLAINTIFF JANE DOE, M.D.**

Dr. Doe declares and states the following:

1. I am a board-certified family medicine physician, with additional specialty training in family planning, and an M.A.S. in clinical research. I am licensed to practice in Texas. I am the medical director of Southwestern Women's Surgical Center ("Southwestern"), a licensed ambulatory surgical center in Dallas, Texas. As medical director, my responsibilities include: review and development of clinic protocols, training of all new physician staff, quality assurance review, representing the medical staff on the administrative management team and governing board.

2. Southwestern provides abortion services through 21.6 weeks of pregnancy as measured from the first day of the woman's last menstrual period ("LMP"). In addition to my other responsibilities as medical director, I also personally provide abortion care to patients through 21.6 weeks LMP.

3. I have reviewed the provisions of S.B. 8 banning "dismemberment" abortions. As explained below, I am very concerned that if this restriction takes effect I may no longer be able

to provide D & E procedures to my patients, and that the burdens it would impose on my patients would undermine their health and their ability to access second-trimester abortion care.

4. The information contained in this declaration is based on my personal knowledge, and the opinions are based on my education, training, experience, and review of applicable medical literature.

**Current Abortion Services**

5. Under current state law, women seeking abortion services who live less than 100 miles from any clinic must receive in-person state-mandated counseling and an ultrasound at least 24 hours prior to the abortion. Women who live more than 100 miles from any clinic are required to wait two hours. Most of our patients receiving abortions live within 100 miles of the center and therefore already must make at least two separate trips to the clinic to receive abortion services.

6. In the first trimester of pregnancy, I provide both medication abortions up to 70 days LMP and surgical abortions using uterine aspiration or suction curettage.

**My Current D & E Practices**

7. Beginning at approximately 15 weeks LMP, and sometimes as early as 14 weeks, I use instruments, such as forceps, in addition to suction, to remove fetal parts. This procedure is known as a dilation and evacuation or a D & E procedure. Although S.B. 8 does not use medical terms to describe what is prohibited, the definition clearly encompasses D & E procedures unless the physician has induced demise prior to using forceps or similar instruments to remove the fetus.

8. As indicated, a D & E procedure involves two steps: dilation and evacuation. Dilation refers to the process of preparing and opening the cervix to allow the safe passage of

instruments. The physician's goal is to achieve enough dilation to safely complete the procedure, but not to dilate more than necessary to avoid damaging the cervix and to minimize the risk of infection.

9. At Southwestern, patients having an abortion between 14.0 and 14.6 weeks LMP typically have a one-day procedure, in which the dilation and evacuation of the uterus occur on the same day (not counting the 24-hour delay for women who live within 100 miles of the clinic).

10. Between 15.0 and 17.6, the dilation process can take either one or two days, depending on the patient. For patients having a two-day procedure, osmotic dilators known as laminaria, which slowly absorb moisture and expand, are placed in the cervix on the first day, and the patient returns the next day for additional cervical preparation and completion of the procedure. In deciding whether the patient will have one or two days of dilation, physicians consider the patient's pregnancy history, the condition of her cervix, and other factors. For example, I may be more likely to achieve adequate dilation in one day for a woman who has had multiple vaginal births, whereas I'm more likely to need two days of dilation for a young woman who has never been pregnant before.

11. Almost all patients between 18.0 and 21.6 weeks LMP have a two-day dilation process.

12. Although highly unusual, some women will, as a result of the dilation process, expel the fetus prior to the evacuation procedure. In those cases, we attempt to see the woman at the clinic, but some women will go to hospital emergency departments, where they receive essentially the same treatment as that provided for women experiencing miscarriages.

13. During the evacuation part of the D & E procedure, I use a combination of suction and forceps to remove the amniotic fluid, the fetus and the placenta. When I use forceps to remove the fetus, the intention is to separate tissue into smaller parts to minimize stress and potential harm to the cervix, as the fetus cannot pass intact through the cervix.

14. I typically begin to use forceps routinely around 15 weeks. Some physicians regularly use forceps as early as 14 weeks and others continue to use suction aspiration alone later into pregnancy.

15. Beginning at 20.0 weeks LMP, the physicians at Southwestern, myself included, attempt fetal demise prior to removing the fetus. As I understand it, we first developed this protocol in response to the federal "partial-birth abortion" law. In my experience, causing fetal demise at 20.0+ weeks using a medication called digoxin can make the procedure easier, but I do not believe that causing demise earlier than 20 weeks would do so. I know that not all physicians share my belief that fetal demise by digoxin provides these or any benefits, regardless of gestation.

16. The physicians at Southwestern, myself included, use digoxin to induce demise. The medication is typically injected transvaginally just prior to insertion of the laminaria. For some women for whom a transvaginal injection is more difficult, due to factors such as uterine or fetal position, the injection is done transabdominally.

17. Digoxin can be injected either into the fetal tissue or into the amniotic fluid. It is more technically difficult to achieve an intrafetal injection, and intrafetal injection is not always possible. Intramniotic injection, while easier to achieve, is not as effective at causing fetal demise. Digoxin, especially if injected intraamniotically, does not work immediately, and may take up to 24 hours to cause demise. The earlier the gestational age, the smaller and less

accessible the fetus will be, and thus I believe it would be more difficult, if not impossible, to complete a transvaginal or transabdominal intrafetal digoxin injection at earlier gestations.

18. Causing demise by digoxin injection carries risks and Southwestern obtains informed consent prior to the procedure. Those risks include: failure to cause demise, early onset of labor, infection, injury to abdominal organs, and pain.

19. The digoxin injection does not always cause fetal demise. If that occurs, I must use my best judgment as a physician as to how to proceed. If the woman is adequately dilated for me to complete the procedure that day, I will almost certainly conclude that it is in her best medical interests to proceed, because with a dilated cervix, delay would expose her to risks of infection, delivery outside of the clinic, and hemorrhage. If she has not achieved adequate dilation, I may decide to insert new laminaria and have the patient return the next day. While in those circumstances I might attempt demise with a second digoxin injection, I would use my best medical judgment in conversation with the patient about the benefits and risks of proceeding with a second injection.

**Impact of the D & E Ban on My Practice**

20. S.B. 8 makes it illegal for me to continue to provide D & E procedures unless I am certain before the procedure starts that I can induce fetal demise before using forceps to remove fetal tissue. Such certainty is not possible for any procedure after approximately 14.0 weeks.

21. As explained above, attempting demise by digoxin is not always successful, but I will not know ahead of time whether it will succeed or fail. At the point that I know if my attempt at demise has been successful, my patient will likely be dilated to a point at which it will not be safe to require her to delay completion of the procedure for another 24 hours. I do not see

how I can start a procedure knowing that I may end up in a situation where I must choose between criminal prosecution and my patient's best interests.

22.     I do not believe that if my attempt to cause demise fails, that the potentially serious risks to the patient from delaying the procedure in order make further efforts to cause demise will likely come within the extremely narrow medical emergency exception.

23.     While I am aware of other means of causing demise, they do not cure the problem caused by S.B. 8's requirement that I ensure demise in every case.

24.     Another means of causing fetal demise prior to removal of the fetus is umbilical cord transection, in which the physician grasps and divides the umbilical cord. After a period of time, the fetal heartbeat will stop. While I have sometimes undertaken transection at later gestational ages, I cannot rely on that procedure as a means of avoiding the D & E ban. Umbilical cord transection is not possible in every case due to factors such as fetal position and the woman's anatomy. While sometimes the cord is easy to grasp, sometimes I cannot reach it at all. Attempting to locate the cord when it is not easily grasped subjects the patient to the risk of uterine perforation and bleeding, and unnecessarily prolongs the procedure. It is also possible that in attempting to grasp the cord I would instead grasp part of the fetus, and therefore violate the ban.

25.     I am also aware that some ob-gyns with a subspecialty in maternal-fetal medicine cause fetal demise by an intracardiac injection of potassium chloride (KCl). I do not have the training to do this, and do not believe it would be possible to incorporate this practice at Southwestern.

26.     For these reasons, I do not see a way that I can begin a D & E procedure without fear of criminal prosecution.

27. Even if there were a failsafe means by which I could induce demise in every case, which there is not, attempting to do so would subject my patients to unacceptable risks and burdens, and force me to practice against my best medical judgment and in conflict with my ethical obligations.

28. Prior to 20.0 weeks LMP, the physicians at Southwestern, myself included, do not take steps to ensure fetal demise before removing the fetus. There is no medical reason to do so, and any steps I might take could subject my patients to an unnecessary medical procedure that would increase risks and potentially prolong the procedure.

29. I am not aware of any medical literature addressing the safety or efficacy of fetal demise prior to 18 weeks for outpatient abortion procedures. In the absence of medical literature, I do not know the level of risk that attempting demise prior to 18 weeks would pose for my patients. While I believe that attempting demise for every patient prior to 18 weeks would be technically difficult, I have no way of knowing how often I would succeed, or how I could safely proceed if my attempt to cause demise didn't work. In other words, attempting to cause demise in every case prior to 18 weeks would require me to subject my patients to unknown risks and results, with no guarantee that I could proceed with the D & E procedure without fear of prosecution.

30. For patients seeking abortions between 18.0 and 19.6 weeks, requiring demise, which I do not believe is necessary and which does not offer any medical benefit, needlessly subjects patients to an unnecessary medical procedure with accompanying risks.

31. In addition to the unnecessary medical procedure and unknown medical risks described above, for patients seeking procedures before 17.6 weeks who, but for S.B. 8 would be undergoing one day procedures, attempting demise by digoxin would add at least one additional

trip to the clinic (regardless of how far away from the clinic the patient lived) and an additional delay of 24 hours.

32. Each additional trip imposes significant burdens, especially for poor women, due to the expenses associated with travel, lost wages, and childcare. Patients at Southwestern who have received digoxin or have osmotic cervical dilators in place overnight are strongly advised not to return to work or engage in any strenuous activity until the abortion process is complete. We also require that they stay within a one hour's drive (in standard traffic) of the clinic, in case they experience symptoms that need urgent evaluation overnight. Given the size of the Dallas-Fort Worth Metroplex, this excludes staying in the farthest parts of the Metroplex and certainly outside of the Metroplex, which are all within 100 miles of the clinic. Patients living farther than one hour's drive usually secure a local hotel room, at their own cost.

33. An alternative means of terminating a pregnancy in the second trimester is induction of labor. Induction cannot take the place of D & E as a means of avoiding the ban. This process can take several hours or days and requires hospitalization, compared to the D & E procedure, which can be performed in an outpatient facility. Forcing women to undergo the process of labor over hours or days in lieu of the D & E procedure, which takes only minutes, offers no medical advantages, but adds unreasonable burdens. In addition, I am not aware of any hospitals in Texas that permit physicians to routinely perform abortions by induction of labor or otherwise.

34. I am very concerned about the negative impact that the D & E ban will have on women seeking second-trimester abortions at 14.0 weeks or later. Because it is not possible to ensure fetal demise in every case, I do not see how I could start a D & E procedure without fear that I will violate the ban and be subject to criminal prosecution. Attempting to comply with the

ban would subject my patients to unnecessary medical procedures that would increase their risks, potentially subject them to pain, and prolong the procedure.  I fear that some women will be unable to overcome the additional burdens created by the ban and will be forced to carry their pregnancies to term, rather than being able to obtain the safe abortion care that I currently provide.

//

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 19th day of July, 2017.

_____
Jane Doe, M.D., M.A.S.