IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

FILED

17 NOV 22  PM 3: 29

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS
BY_____
                    CLERK

| | |
|---|---|
| WHOLE WOMAN'S HEALTH, § <br> PLANNED PARENTHOOD CENTER § <br> FOR CHOICE, PLANNED § <br> PARENTHOOD OF GREATER TEXAS § <br> SURGICAL HEALTH SERVICES, § <br> PLANNED PARENTHOOD SOUTH § <br> TEXAS SURGICAL CENTER, ALAMO § <br> CITY SURGERY CENTER PLLC, D/B/A § <br> ALAMO WOMEN'S REPRODUCTIVE § <br> SERVICES, SOUTHWESTERN § <br> WOMEN'S SURGERY CENTER, NOVA § <br> HEALTH SYSTEMS, INC. D/B/A § <br> REPRODUCTIVE SERVICES, EACH § <br> ON BEHALF OF ITSELF, ITS STAFF, § <br> PHYSICIANS, AND PATIENTS, ROBIN § <br> WALLACE, M.D., BHAVIK KUMAR, § <br> M.D., M.P.H., AND ALAN BRAID, § <br> M.D., EACH ON THEIR OWN BEHALF § <br> AND ON THEIR PATIENTS' BEHALF, § <br> PLAINTIFFS, § <br> § | |
| V. § | CAUSE NO. A-17-CV-690-LY |
| § <br> KEN PAXTON, ATTORNEY GENERAL § <br> OF TEXAS, IN HIS OFFICIAL § <br> CAPACITY, AND MARGARET § <br> MOORE, DISTRICT ATTORNEY FOR § <br> TRAVIS COUNTY, NICHOLAS § <br> LAHOOD, CRIMINAL DISTRICT § <br> ATTORNEY FOR BEXAR COUNTY, § <br> JAIME ESPARZA, DISTRICT § <br> ATTORNEY FOR EL PASO COUNTY, § <br> FAITH JOHNSON, DISTRICT § <br> ATTORNEY FOR DALLAS COUNTY, § <br> SHAREN WILSON, CRIMINAL § <br> DISTRICT ATTORNEY TARRANT § <br> COUNTY, RICARDO RODRIGUEZ, JR., § <br> CRIMINAL DISTRICT ATTORNEY § <br> FOR HIDALGO COUNTY, ABELINO § <br> REYNA, CRIMINAL DISTRICT § <br> ATTORNEY FOR MCLENNAN § | |

COUNTY, AND KIM OGG, CRIMINAL  §
DISTRICT ATTORNEY FOR HARRIS   §
COUNTY, EACH IN THEIR OFFICIAL §
CAPACITY,                      §
            DEFENDANTS.   §
                        §

## MEMORANDUM OPINION
## INCORPORATING FINDINGS OF FACT AND CONCLUSIONS OF LAW

Before the court is the above-styled and numbered action by which Plaintiffs, all providers of second-trimester abortion services in Texas, challenge the constitutionality of recently enacted Texas abortion laws.[1]  *See* 42 U.S.C. § 1983.  The laws at issue regulate second-trimester abortion procedures and are included in Texas Senate Bill 8, Section 6, which, *inter alia*, creates a new Subchapter G in the Texas Health and Safety Code.  *See* Act of May 26, 2017, 85th Leg., R.S., ch. 441, § 6, 2017 Tex. Sess. Law Serv. 1167-68 (West) (to be codified at Tex. Health & Safety Code Ch. 171, Subchapter G, §§ 171.151-.154) (the "Act").[2]

Plaintiffs allege that the Act's requirement that Texas physicians ensure fetal demise *in utero* before performing the evacuation phase of a standard D&E abortion, which nationally is the most commonly performed second-trimester abortion, is a substantial obstacle to a woman's exercise of

---

[1]  Plaintiffs Whole Woman's Health, Planned Parenthood Center for Choice, Planned Parenthood of Greater Texas Surgical Health Services, Planned Parenthood South Texas Surgical Center, Alamo City Surgery Center PLLC, Southwestern Women's Surgery Center, Nova Health Systems, Inc., Robin Wallace, M.D., Bhavik Kumar, M.D., M.P.H., and Alan Braid, M.D., bring this action on behalf of themselves their staff, physicians, and patients (collectively "Plaintiffs").

[2]  The Act was effective September 1, 2017.  *Id.* at ch. 441, § 22.  The court temporarily enjoined enforcement of the Act.  *See infra* pp. 3-4.

her right to choose a lawful previability second-trimester abortion.[3]   Therefore, Plaintiffs claim, the

Act is unconstitutional, and, accordingly, the court must declare the Act is void and order injunctive

relief to prevent Defendants from enforcing the Act.

Defendants respond that the Act does not place an undue burden on a woman seeking a

second-trimester abortion.   Rather, say Defendants, the Act's requirement that a physician ensure

fetal demise is an appropriate regulation of an abortion procedure.   Specifically, Defendants argue

that the Act is narrowly drawn, regulates the moment of fetal demise–the lethal act–and does no more

than provide for a humane termination of fetal life.   The Act, Defendants urge, is therefore a proper

mechanism by which the State of Texas may express profound respect for the life of the unborn.

Following a hearing at which all parties were represented by counsel, the court rendered a

Temporary Restraining Order ("Temporary Order").   *Whole Woman's Health v. Paxton*, No. 1:17-

CV-690-LY (W.D. Tex. Aug. 31, 2017).   The Temporary Order enjoined Defendants as well as their

employees, agents, and successors in office from enforcing the Act.[4]   Following rendition of the

---

[3]   The court refers to the abortion procedure at issue as a "standard D&E" procedure to distinguish it from an "intact D&E," also known as a "D&X" procedure, which involves dilating the cervix enough to remove the fetus intact.   The intact D&E or D&X procedure is banned under the Federal Partial-Birth Abortion Ban Act of 2003, unless fetal demise is induced before the procedure. *See* 18 U.S.C. § 1531; *Gonzales v. Carhart*, 550 U.S. 124 (2007) (upholding federal partial-birth abortion ban).

A second-trimester partial-birth abortion occurs when a physician causes fetal demise after delivering vaginally an intact living fetus to an anatomical landmark.   *Gonzales*, 550 U.S. at 147-48. A fetus's anatomical landmarks are, in the case of a head-first presentation, the entire fetal head outside the woman's body or, in the case of breech presentation, any part of the fetal trunk past the navel outside the woman's body.   *Id.*

Texas recently banned partial-birth abortions and that law is not at issue in this case.   *See* Act of May 26, 2017, 85th Leg., R.S., ch. 441, § 6, 2017 Tex. Sess. Law Serv. 1166-67 (West) (to be codified at Tex. Health & Safety Code Ch. 171, Subchapter F, §§ 171.101-.106).

[4]   Plaintiffs and five of the eight local-prosecutor defendants, including Defendants Bexar County Criminal District Attorney Nicholas LaHood, El Paso District Attorney Jaime Esparza, Harris

Temporary Order, the parties informed the court that they agreed to: (1)  forego arguing a preliminary injunction; (2) extend the effectiveness of the Temporary Order; (3) conduct discovery; and (4) proceed to a bench trial on the merits.  The court considered the parties' agreement, ordered the Temporary Order extended through November 22, 2017, and set this case for trial to the bench. *Whole Woman's Health*, No. 1:17-CV-690-LY (W.D. Tex. Sept. 11, 2017).

On November 2, 2017, the court commenced a bench trial that concluded on November 8, 2017.  All parties were represented by counsel.  Having considered the case file, trial testimony, exhibits, arguments of counsel, post-trial filings, and applicable law, the court renders the following findings of fact and conclusions of law.[5]

---

County Criminal District Attorney Kim Ogg, Hidalgo County Criminal District Attorney Ricardo Rodriguez, Jr., and Travis County District Attorney Margaret Moore ("Nonparticipating Defendants") stipulated to the following: (1) the Nonparticipating Defendants will not (a) enforce the challenged portions of the Act until a final non-appealable decision has been rendered in this action; (b) participate in litigating this action unless required to do so thereby conserving prosecutorial resources; and (c) will not file answers, unless ordered by the court; and (2) Plaintiffs (a) will take no default judgment against the Nonparticipating Defendants; and (b) will not seek attorney's fees, penalties, damages, or any costs or expense of any kind from the Nonparticipating Defendants.

Defendants Dallas County District Attorney Faith Johnson, McLennan County Criminal District Attorney Abelino Reyna, and Tarrant County Criminal District Attorney Sharen Wilson are actively participating in this action.  As the interests of these three local-prosecutor defendants are aligned with Paxton, the court refers to them collectively as "the State."

[5] In making these findings and conclusions, the court has considered the record as a whole. The court has observed the demeanor of the witnesses and has carefully weighed that demeanor and the witnesses' credibility in determining the facts of this case and drawing conclusions from those facts.  Further, the court has thoroughly considered the testimony of both sides' expert witnesses and has given appropriate weight to their testimony in selecting which opinions to credit and upon which not to rely.  *See Garcia v. Kerry*, 557 Fed. Appx. 304, 309 (5th Cir. 2014) ("It is settled law that the weight to be accorded expert opinion evidence is solely within the discretion of the judge sitting without a jury.  In a bench trial, the district court is not obligated to accept or credit expert witness testimony.") (citing *Pittman v. Gilmore*, 556 F.2d 1259, 1261 (5th Cir. 1977); *Albany Ins. Co. v. Anh Thi Kieu*, 927 F.2d 882, 894 (5th Cir. 1991)).  The court concludes that all witnesses who testified as an expert were qualified to do so.  Courts are not well equipped to weigh competing medical

## I.  THE ACT

The Act defines a dismemberment abortion as:

> dismember[ing] the living unborn child and extract[ing] the unborn child one piece at a time from the uterus through the use of clamps, grasping forceps, tongs, scissors, or a similar instrument that, through the convergence of two rigid levers, slices, crushes, or grasps, or performs any combination of those actions on, a piece of the unborn child's body to cut or rip the piece from the body.  The term does not include an abortion that uses suction to dismember the body of an unborn child by sucking pieces of the unborn child into a collection container.  The term includes a dismemberment abortion that is used to cause the death of an unborn child and in which suction is subsequently used to extract pieces of the unborn child after the unborn child's death.

Ch. 441, § 6 (to be codified at Tex. Health & Safety Code § 171.151).  The Act further provides:

> Dismemberment Abortions Prohibited.
>
> (a) A person may not intentionally perform a dismemberment abortion unless the dismemberment abortion is necessary in a medical emergency.
>
> (b) A woman on whom a dismemberment abortion is performed, an employee or agent acting under the direction of a physician who performs a dismemberment abortion, or a person who fills a prescription or provides equipment used in a dismemberment abortion does not violate Subsection (a).

*Id.* (to be codified at Tex. Health & Safety Code § 171.152).  A "medical emergency," is defined as:

> a life-threatening physical condition aggravated by, caused by, or arising from a pregnancy that, as certified by a physician, places the

---

testimony from equally qualified witnesses.  The court, however, has carefully considered the testimony, compared each expert witness' testimony with that of the others, and makes these findings on what the court concludes is the greater weight of the credible evidence.  All findings of fact contained herein that are more appropriately considered conclusions of law are to be so deemed. Likewise, any conclusion of law more appropriately considered a finding of fact shall be so deemed.

woman in danger of death or a serious risk of substantial impairment
of a major bodily function unless an abortion is performed.

Texas Health & Safety Code Ann. § 171.002(3) (West 2017).  A physician found to be in violation

of the Act commits a state-jail-felony criminal offense punishable by a minimum of 180 days to a

maximum of two years in jail and a fine of up to $10,000.  Ch. 441, § 6 (to be codified at Tex. Health

& Safety Code § 171.153); Tex. Penal Code Ann. § 12.35(a), (b) (West Supp. 2016).

Thus, the Act includes civil and criminal penalties for those who perform a dismemberment

abortion.  "Dismemberment abortion" is not a medical term used by physicians nor have the parties

directed the court to any medical reference using the term.  Although the Act does not specifically

state, the parties do not dispute that the Act prohibits the performance of an outpatient standard D&E

abortion unless fetal demise occurs *in utero* before the fetus is removed from the woman.  It is also

undisputed that after approximately 15 weeks of pregnancy and before a fetus is viable, nationwide

the most common second-trimester abortion is a standard D&E without inducing *in utero* fetal

demise.[6]

## II.  REVIEW OF ABORTION REGULATIONS

This case is not the first attempt by a state to regulate second-trimester abortions.  The court

thus begins its analysis by reviewing existing law.  Three basic principles arising from *Planned*

---

[6]  The duration of a woman's pregnancy is commonly referred to by trimesters.  The first trimester runs from the first through twelfth week and the second trimester runs from the thirteenth through twenty-sixth week.  *See Stenberg v. Carhart*, 530 U.S. 914, 923-25 (2000).  The third trimester begins the twenty-seventh week and continues through the end of the pregnancy.  Medical literature refers to the gestational age of a fetus as the number of weeks after a woman's last menstrual period–"LMP"–followed after a decimal point by the number of days of the subsequent week.  For example, "16.0 LMP" represents a gestational age of 16 weeks, 0 days, while "17.6 weeks LMP" represents a gestational age of 17 weeks, 6 days.  The court will refer to only complete weeks and absent the LMP designation.

*Parenthood of Southeastern Pennsylvania v. Casey*, 505 U.S. 833 (1992), guide this court.  First,

before fetal viability it is the right of a woman,

> to obtain an abortion without undue interference from the State.
> Before viability, the State's interests are not strong enough to support
> a prohibition of abortion or the imposition of a substantial obstacle to
> the woman's effective right to elect the procedure.   Second is a
> confirmation of the State's power to restrict abortions after fetal
> viability, if the law contains exceptions for pregnancies which
> endanger the woman's life or health.  And third, the principle that the
> State has legitimate interests from the outset of the pregnancy in
> protecting the health of the woman and the life of the fetus that may
> become a child.

*Gonzales v. Carhart*, 550 U.S. 124, 145 (2007); *see also Stenberg v. Carhart*, 530 U.S. 914, 921

(2000).

Before viability, a state "may not prohibit any woman from making the ultimate decision to

terminate her pregnancy."  *Gonzales*, 550 U.S. at 146 (quoting *Casey*, 505 U.S. at 879); *see also*

*Stenberg*, 530 U.S. at 921.  Also, a state "may not impose upon this right an undue burden, which

exists if a regulation's 'purpose or effect is to place a substantial obstacle in the path of a woman

seeking an abortion before the fetus attains viability.'"  *Id.*  On the other hand, "regulations which do

no more than create a structural mechanism by which the State . . . may express profound respect for

the life of the unborn are permitted, if they are not a substantial obstacle to the woman's exercise of

the right to choose."  *Id.* (quoting *Casey*, 505 U.S. at 877).

In *Whole Woman's Health v. Hellerstedt*, the Court reiterated the undue-burden standard:

"a statute which, while furthering [a] valid state interest, has the effect of placing a substantial

obstacle in the path of a woman's choice cannot be considered a permissible means of serving its

legitimate ends." _____ U.S. ___, 136 S.Ct. 2292, 2309 (2016) (quoting *Casey*, 505 U.S. at 877).

"The rule announced in *Casey*, [] requires that courts consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Whole Woman's Health*, 136 S.Ct. at 2309. "A finding of an undue burden is a shorthand for the conclusion that a state regulation has the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion of a nonviable fetus." *Casey*, 505 U.S. at 877. Whether an obstacle is substantial–and a burden is therefore undue–must be judged in relation to the benefits that the law provides. *Whole Woman's Health*, 136 S.Ct. at 2309. Where a law's burdens exceed its benefits, those burdens are by definition undue, and the obstacles they embody are by definition substantial. *Id.* at 2300, 2309-10, 2312, 2318. In the bitter debate surrounding whether society should sanction any abortion, "substantial" is often called upon to carry a greater weight than contextual analysis justifies. The court construes "substantial" to mean no more and no less than "of substance."

This court, in conducting an undue-burden analysis, must "consider the burdens a law imposes on abortion access together with the benefits those laws confer." *Id.* at 2309. The court must "weigh[] the asserted benefits against the burdens." *Id.* at 2310. Said another way, the court must answer the question, "does the benefit bring with it an obstacle of substance?"

## III. THE SUPREME COURT HAS PREVIOUSLY ADDRESSED SECOND-TRIMESTER ABORTIONS

On two occasions the Supreme Court has reviewed state laws challenged on the basis that, by their effect, the laws (1) banned the previability standard D&E procedure and (2) the ban was an undue burden on women's right to choose an abortion. *See Gonzales*, 550 U.S. at 132; *Stenberg*, 530 U.S. at 920. In each instance, the Court determined that to the extent a law directly reached or might be interpreted in such a way to reach the previability standard D&E procedure performed

8

before fetal demise, the law imposed an undue burden on a woman seeking a pre-fetal-viability abortion. *Gonzales*, 550 U.S. at 164-65; *Stenberg*, 530 U.S. at 939. In each case, the Court determined that, although a law that by its effect bans partial-birth abortions and is appropriately narrow may stand, a broadly written law with the effect of also banning previability standard D&E abortions cannot withstand the undue-burden test. *Stenberg*, U.S. at 939-40.

*Gonzales* addresses a federal law that punishes one who knowingly performs a partial-birth abortion. There the Court reviewed the previability standard D&E procedure, observing the following,

> Some doctors, especially later in the second trimester, may kill the fetus a day or two before performing the surgical evacuation. They inject digoxin or potassium chloride into the fetus, the umbilical cord, or the amniotic fluid. Fetal demise may cause contractions and make greater dilation possible. Once dead, moreover, the fetus' body will soften, and its removal will be easier. Other doctors refrain from injecting chemical agents, believing it adds risk with little or no medical benefit.

*Id.* at 136.

*Gonzales* holds that because the law the Court was reviewing "allows, among other means, a commonly used and generally accepted method,[] it does not construct a substantial obstacle to the abortion right." 550 U.S. at 165. "The conclusion that the [law] does not impose an undue burden is supported by other considerations. Alternatives are available to the prohibited procedure. As we have noted, the [law] does not proscribe [the standard] D&E." *Id.* at 164. The law's "prohibition only applies to the delivery of 'a living fetus.'" *Id.* Drafting the law so narrowly "allows, among other means, a commonly used and generally accepted method, so it does not construct a substantial obstacle to the abortion right." *Id.* at 165. The "other means" and "generally accepted method"

referred to in *Gonzales* is the standard D&E procedure performed before fetal demise.  Further, the

Court in *Gonzales* found that the law in question, "excludes most [standard] D&Es in which the fetus

is removed in pieces, not intact.  If a doctor intends to remove the fetus in parts from the outset, the

doctor will not have the requisite intent to incur criminal liability."  550 U.S. at 151.

Previously, the Court held in *Stenberg* that a broadly drawn state law that in addition to

banning the D&X procedure by its effect also banned the standard D&E procedure.  The Court held

that because the law under review was not narrowly tailored to include only the D&X procedure, the

law imposed an undue burden upon a woman's right to choose a previability abortion.  *Stenberg*, 530

U.S. at 945-46.

> In sum, using this law some present prosecutors and future Attorneys
> General may choose to pursue physicians who use [the standard]
> D&E procedures, the most commonly used method for performing
> previability second trimester abortions.   All those who perform
> abortion procedures using that method must fear prosecution,
> conviction, and imprisonment.  The result is an undue burden upon a
> woman's right to make an abortion decision.  We must consequently
> find the statute unconstitutional.

*Id.*

This court need look no further.  Although narrowly drawn, the Act has the undisputed effect

of banning the standard D&E procedure when performed before fetal demise.  Presented with the

Supreme Court's determinations in *Stenberg* and *Gonzalez*–that laws with the effect of banning the

standard D&E procedure result in an undue burden upon a woman's right to have an abortion and

are therefore unconstitutional–the court concludes, based on existing precedent alone, the Act must

fail.  Once the Supreme Court has defined the boundaries of a constitutional right, a district court may

not redefine those boundaries.[7]  Further the role of the district court is to preserve a right, not to search for a way to evade or lessen the right.

## IV.  CURRENT FETAL-DEMISE LITIGATION

At least seven states other than Texas have enacted fetal-demise laws similar to the Act.  In some of those states, similar challenges to that here have been raised.[8]

A federal district court in Alabama rendered a permanent injunction enjoining Alabama from enforcing a similar fetal-demise law.  *See West Ala. Women's Ctr. v. Miller*, No. 2:15-CV-497-MHT, ___ F.Supp. 3d ___, 2017 WL 4843230 (M.D. Ala. Oct. 26, 2017).  The court concluded that the law imposed an undue burden on women seeking previability abortions at the only two clinics in Alabama that provide abortions beginning at 15 weeks.  The court concluded that the Alabama law would unquestionably prevent women in Alabama from obtaining a previability abortion after 15 weeks.  The court determined that there was no question that the fetal-demise law is unconstitutional as applied to the plaintiffs.  *Id.*

In Arkansas, a federal district court rendered a preliminary injunction after concluding that should an Arkansas fetal-demise law be allowed to become effective, the fraction of women for whom

---

[7]  The federal courts spread across the country owe respect to each other's efforts and should strive to avoid conflicts, but each has an obligation to engage independently in reasoned analysis.  Binding precedent for all is set only by the Supreme Court, and for the district courts within a circuit, only by the court of appeals for that circuit.

*In re Korean Air Lines Disaster of Sept. 1, 1983*, 829 F.2d 1171, 1176 (D.C. Cir. 1987) (Ginsberg, J.).

[8]  There have been no legal challenges raised to the fetal-demise laws in Mississippi and West Virginia.

the law is relevant would immediately lose the right to obtain a previability abortion anywhere in the state after 14 weeks. *Hopkins v. Jegley*, No. 4:17-CV-00404-KGB _____ F.Supp. 3d _____, 2017 WL 3220445 (E.D. Ark. July 28, 2017), *appeal docketed*, No. 17-2879 (8th Cir. Aug. 28, 2017).

The Kansas Court of Appeals, by an equally divided court, affirmed a district court's grant of a temporary injunction that enjoined a similar fetal-demise law. *Hodes & Nauser v. Schmidt MDs, P.A.*, 368 P.3d 667 (Kan. Ct. App. 2016) (en banc). The plaintiffs alleged that the law violated the Kansas Constitution's right to an abortion. "Given the additional risk, inconvenience, discomfort, and potential pain associated with these alternatives [digoxin or potassium-chloride injections or umbilical-cord transection], some of which are virtually untested, we conclude that banning the standard D&E, a safe method used in about 95% of second-trimester abortions, is an undue burden on the right to abortion." *Id.* at 678.

In Oklahoma, a state district court granted a temporary injunction preventing a similar fetal-demise law from taking effect. *Nova Health Sys. v. Pruitt*, No. CV-2015-1838, slip op. (Okla. Cty. Dist. Ct. Oct. 28, 2015). Applying federal law, the court recognized the determinations made in *Gonzales* and *Stenberg* and that the Supreme Court had previously balanced the same competing interests. The court ruled, *inter alia*, that the plaintiffs had demonstrated a likelihood of success on the merits that the law was likely to be found unconstitutional. *Id.*

In Louisiana, a similar suit has been filed. *June Med. Servs. LLC v. Gee*, No. 3:16-CV-0444-BAJ (M.D. La. July 1, 2016).

The court finds persuasive the reasoning expressed by these courts regarding similar laws requiring fetal demise before a physician may perform a standard D&E abortion.

12

## V. THE INTEREST OF THE STATE OF TEXAS

No legislative findings accompany the Act. Therefore, this court does not have an explanation from the Texas Legislature of its purpose in enacting the law. Generally, a state bears the burden of demonstrating a link between the legislation enacted and what it contends are the state's interests. *See Akron v. Akron Ctr. for Reproductive Health, Inc.*, 462 U.S. 416, 430 (1983), *overruled on other grounds*, *Casey*, 505 U.S. at 833 (describing state's burden). The State here argues that the Act advances respect for the dignity of the life of the unborn and protects the integrity of the medical profession. The court assumes without deciding the legitimacy of these interests. *See Whole Woman's Health*, 136 S.Ct. at 2310 (assuming state had legitimate interests despite law's lack of legislative findings).

## VI. BURDEN ON WOMEN

Plaintiffs claim that the Act forces a Texas woman who is between 15 and 20 weeks pregnant and seeking a previability abortion to wait an additional 24 hours, make an additional trip to the provider for a fetal-demise procedure, sustain an additional invasive, medically unnecessary procedure, and be subjected to heightened health risks.[9] Further, Plaintiffs claim physicians will stop performing standard D&E abortions altogether due to ethical and legal concerns, thereby rendering abortions essentially unavailable to a Texas woman who is 15 weeks pregnant.

The State responds that the Act does not render second-trimester abortions unavailable, because fetal demise can be safely achieved with one of three procedures before a physician performs a standard D&E: (1) use of a hypodermic needle to inject the drug digoxin transabdominally or

---

[9] In Texas, it is only in extraordinary circumstances that an abortion may be performed after 20 weeks. *See* Tex. Health & Safety Code Ann. §§ 171.044, .046 (West 2017).

vaginally; (2) an injection of potassium chloride directly into the fetal heart; and (3) umbilical-cord transection. By causing fetal demise before performing the evacuation portion of the standard D&E, a physician does not violate the Act. The State argues that the Act, therefore, neither bans the standard D&E procedure nor places an undue burden on a woman's right to choose a second-trimester abortion.

As with the State's interest in passing the Act, there are no legislative findings that these fetal-demise procedures are safe and effective or that any is necessary for the preservation of the life or health of the woman. The court, based on the judicial record, will make its own findings in that regard. *See Whole Woman's Health*, 136 S.Ct. at 2310 ("[T]he relevant statute here does not set forth any legislative findings. Rather, one is left to infer that the legislature sought to further a constitutionally acceptable objective. For a district court to give significant weight to evidence in the judicial record in these circumstances is consistent with this Court's case law.")

## VII. BENEFITS AND BURDENS

### Second-trimester abortions

> Considering the fact that [second-trimester partial-birth and standard D&E abortion] procedures seek to terminate a potential human life, our discussion may seem clinically cold or callous to some, perhaps horrifying to others. There is no alternative way, however, to acquaint the reader with the technical distinctions among different abortion methods and related factual matters, upon which the outcome of this case depends.

*Stenberg*, 530 U.S. at 923. The Court then describes in great detail the methods of performing an abortion. *See id.* at 923-29; *Gonzales*, 550 U.S. at 135-37. The description in *Stenberg*, is consistent with the evidence presented to this court in every material respect. The standard D&E procedure has not materially changed in medical practice since physicians across the country began performing the

14

procedure in the 1970s.  An abortion always results in the death of the fetus.  The extraction of the fetus from the womb occurs in every abortion.  Dismemberment of the fetus is the inevitable result. The evidence before the court is graphic and distasteful.  But this evidence is germane only to the State's interest in the dignity of fetal life and is weighed on the State's side of the scale.  It does not remove weight from the woman's side.  And it does not add weight to tip the balance in the State's favor.

At 15 weeks and sometimes sooner, physicians perform surgical abortions and most often perform a standard D&E procedure.  The physician dilates the woman's cervix and may use a combination of suction and forceps or other instruments to remove the fetus and other *in utero* tissue through the dilated cervical opening.  At 15 weeks, because the fetus is larger than the dilated cervical opening, separation or disarticulation of fetal tissue usually occurs, as the physician will use instruments in addition to suction to move fetal tissue through the cervix.[10]  The evacuation phase takes approximately 10 minutes.  The standard D&E procedure is safely performed as a one-day outpatient procedure and is the most common abortion procedure available after 15 weeks of pregnancy.

Other than a standard D&E, the only abortion procedure available to physicians during the second trimester is induction abortion, by which the physician uses medication to induce labor and delivery of a nonviable fetus.  Induction of labor is uncommon both in Texas and nationally. Induction abortions must be performed in a hospital or similar facility that has the capacity to monitor a patient overnight.  Induction abortions can last from five hours to three days; are extremely

---

[10]  Generally, before 15 weeks physicians do not use the standard D&E procedure because the fetus and all other *in utero* materials will pass through a dilated cervix using only suction.

expensive; entail more pain, discomfort, and recovery time for the patient than a standard D&E procedure; and are medically contraindicated for some patients.

There is no dispute that the Act does not apply to a standard D&E procedure during which the physician–through a separate procedure–causes fetal demise before beginning the evacuation phase of the abortion.  Although procedures that cause fetal demise before evacuation exist–(1) use of a hypodermic needle to inject digoxin; (2) an injection of potassium chloride directly into the fetal heart; and (3) an umbilical-cord transection–Plaintiffs contend none is safe, adequately studied, or medically appropriate.  Plaintiffs contend that physicians attempting any of these other procedures before evacuation, would impose risks with no medical benefit to the patient, each of these procedures is untested, has unknown risks, and is of uncertain efficacy.  Requiring fetal demise in every instance before starting evacuation would mandate that physicians experiment on their patients, and many or even most physicians would decline to do so.

The State responds that physicians, especially later in the second trimester, are able to cause fetal demise by injecting digoxin or potassium chloride into the fetus a day or two before performing the evacuation portion of the D&E procedure.  Thus, far from imposing a ban on the standard D&E procedure, the State argues the Act does not prevent doctors from performing a second-trimester abortion.

The Act criminalizes the performance of a standard D&E abortion unless fetal demise occurs before the evacuation.  Accordingly, the State contends that the court's determination whether the law imposes a substantial obstacle to abortion access turns on the feasibility of the State's proposed fetal-demise methods.  Although the court will consider the argument, the State's reliance on adding an additional step to an otherwise safe and commonly used procedure in and of itself leads the court

16

to the conclusion that the State has erected an undue burden on a woman's right to terminate her pregnancy prior to fetal viability. After considering all of the medical expert testimony, the court concludes that pre-evacuation fetal demise provides no additional medical benefit to a woman undergoing a standard D&E abortion.

Again, as there are no legislative findings that any method to cause *in utero* fetal demise is safe and effective, the court proceeds to make its own findings based on the judicial record. *See Whole Woman's Health*, 136 S.Ct. at 2310.

### *Fetal demise by digoxin injection*

To inject digoxin, physicians begin by using an ultrasound machine to visualize the woman's uterus and the fetus. The physician then inserts a long surgical needle–approximately four inches in length–through the patient's skin, abdomen, and uterine muscle, in order to inject the drug into the fetus. Digoxin works slowly. Physicians generally allow 24 hours after the injection before attempting the evacuation phase of a standard D&E. If the attempt to inject into the fetus fails, the physician may inject digoxin into the amniotic fluid, but evidence suggests that method is less effective in causing fetal demise. Digoxin injections are painful and invasive because they are administered through a transabdominal needle without anesthesia. This may be somewhat alleviated by injecting digoxin transvaginally, preceded by pain-relieving injections and moderate sedation.

When injected into the fetus or amniotic fluid, digoxin has a failure rate ranging between 5% and 10%. A variety of factors, such as uterine positioning, fetal positioning, and the presence of uterine fibroids, can affect whether the physician is actually able to inject digoxin into the fetus or the amniotic fluid successfully. First, fetal and uterine positioning can affect whether the physician is able to reach the fetus or the amniotic fluid with a needle. Additionally, uterine fibroids, which are benign

17

tumors on the uterine walls affecting over half of women, may impede the needle, because they may be calcified and impenetrable. These factors can make it difficult or impossible for the needle to reach the fetus or the amniotic fluid. The court finds that digoxin injections are not always reliable for inducing fetal demise.

The majority of studies on digoxin injection focus on pregnancies at or after 18 weeks. Only a few studies have included cases at 17 weeks, and no study has been presented to the court on the efficacy, dosage, or safety of injecting digoxin into women before 17 weeks of pregnancy. Requiring digoxin injection before 18 weeks of pregnancy, therefore, would require a woman be subjected to an arguably experimental procedure without any counterbalancing benefits.

Additionally, the testimony of all opining experts reveals that digoxin injections are associated with heightened risk of extramural delivery–the unexpected and spontaneous expulsion of the fetus from the uterus while the woman is outside a clinical setting and without medical help–as well as heightened risk of infection and subsequent hospitalization, compared to the standard D&E procedure. A study showed that a digoxin injection is six times more likely to result in hospitalization compared to injection of a placebo; the injection carries an increased risk of infection; and it is twice as likely than amniocentesis to result in extramural delivery. Additionally, an extramural delivery of the fetus can cause bleeding and require medical attention, aside from being very upsetting to the woman. The court finds that even when administered successfully after 18 weeks, digoxin injections carry significant health risks.

A woman undergoing a digoxin injection would be required to make an additional trip to the clinic 24 hours before her appointment for the standard D&E procedure. In Texas, a woman seeking an abortion must, on the first visit to an abortion clinic, receive an ultrasound and state-mandated

18

counseling. *See* Tex. Health & Safety Code Ann. §§ 171.011-.012 (West 2017). The woman must then wait at least 24 hours before making a second visit. If seeking a second-trimester abortion, the woman would then receive the digoxin injection. Finally, on a third visit, which the court finds would almost invariably occur the next day, the woman would undergo the standard D&E abortion procedure.

Based on the unreliability of the procedure, unknown risks for women before 18 weeks of pregnancy, the potential need to inject a second dose of digoxin, increased risk of complications, increased travel burden, and the pain and invasiveness of the procedure, the court finds that digoxin injection is not a feasible method of, in all instances, inducing fetal demise before performing the evacuation phase of a standard D&E abortion. The court concludes, however, that in all instances the procedure would create a substantial obstacle to woman's right to an abortion.

### *Fetal demise by potassium-chloride injection*

Potassium chloride will also cause fetal demise if injected directly into the fetal heart. Physicians administer potassium-chloride injections by using an ultrasound machine as a guide for viewing and inserting a long surgical needle through a woman's abdomen, and uterine muscle, and then into the fetal heart, which is very small; at 15 weeks of pregnancy, the fetal heart is about the size of a dime. Usually potassium-chloride injections are performed in a hospital, not a clinic. Upon administering potassium chloride, the fetal heart stops almost immediately. As with digoxin, potassium-chloride injections are invasive and painful, because they are administered through a transabdominal surgical-needle injection without anesthesia.

Injecting potassium chloride requires great technical skill and is extremely challenging. The procedure requires extensive training generally available only to subspecialists in high-risk obstetrics,

19

referred to as maternal-fetal medicine.  The record evidence is, and there is no credible dispute, that the procedure of injecting potassium chloride is very rare, as it carries much more severe risks for a woman, including death if the physician places the solution in the wrong place.

Physicians at Texas abortion clinics who are not trained in maternal-fetal medicine, would have to receive training to induce fetal demise through injection of potassium chloride.  This particular training is not taught to obstetrics and gynecology residents or to family-planning fellows, whose training involves abortion care, because the procedure is generally only used for high-risk, multi-fetal pregnancy reductions.[11]  Indeed the only subspecialists who are trained to perform potassium-chloride injections are maternal-fetal medicine fellows, who go through three years of highly supervised training to specialize in high-risk pregnancies.  The court finds it would be virtually impossible for all physicians at abortion clinics to receive the specialized training necessary in order for this procedure to be a meaningfully available fetal-demise method in Texas.

Additionally, potassium-chloride injections carry serious risks to the patient.  Because potassium chloride has harmful effects on the heart, inadvertently injecting it into the woman's circulation can endanger the woman.  Injections of potassium chloride may also increase the risk of uterine perforation and infection, due to the inherent risks associated with transabdominal injections. Given all of this, the risk associated with a potassium-chloride injection before the evacuation phase of the standard D&E abortion is not quantifiable because there has been no study on the efficacy or safety of the injection when administered in this manner.

---

[11]  A multi-fetal pregnancy reduction is a procedure during which one or more of the fetuses in the same pregnancy are terminated and the rest are carried to full term.

Finally, as with digoxin, fetal and uterine positioning, and the presence of uterine fibroids may complicate or even prevent the administration of potassium-chloride injections in many women.  And as with a digoxin, a potassium-chloride injection is unnecessary and a potentially harmful medical procedure with no counterbalancing medical benefit for the woman.

The court finds that potassium-chloride injections are not a feasible method of inducing fetal demise before a physician conducts the evacuation phase of a standard D&E procedure.   The procedure is technically challenging and has serious health risks.  Additionally, there is no practical way for Plaintiffs to receive adequate training so that they may perform potassium-chloride injections safely.  The court finds potassium-chloride injection to be an unavailable method for physicians attempting to induce fetal demise before performing the evacuation phase of a standard D&E abortion in Texas.  To the extent the procedure could or would be used, the court concludes that, like a digoxin injection, the procedure would create a substantial obstacle to woman's right to an abortion.

### *Fetal demise by umbilical-cord transection*

To perform umbilical-cord transection, the physician dilates the woman's cervix enough to allow the passage of instruments to transect the cord.  Once the cervix is dilated, the physician uses ultrasound to visualize the umbilical cord.  Using the ultrasound for guidance, the physician then punctures the amniotic membrane, inserts an instrument into the uterus, grasps the cord, and with another instrument cuts the cord.  The physician must then wait for the fetal heart activity to cease, which usually occurs within 10 minutes, after which the physician could perform the evacuation phase of the standard D&E procedure.

The success and ease of umbilical-cord transection depends on the placement of the umbilical cord.  If the umbilical cord is blocked by the fetus, it could be very difficult and very risky to attempt

21

to grasp the cord.  Also, other factors make cord transection technically difficult:  (1) lack of visualization; (2) continuous shrinking of the uterus; and (3) the size of the umbilical cord.

Although the physician can easily view the fetus and the umbilical cord by ultrasound before the amniotic membrane is punctured, once punctured, the amniotic sac drains from the uterus, which makes it more difficult to view the location of the umbilical cord.  As the fluid drains, the uterus contracts, pushing the contents of the uterus against each other.  Thus, the physician must identify, reach, and transect the cord with a surgical instrument without good visualization aid or space between different types of tissues.  Depending on a woman's week of pregnancy, the cord may be very thin; at 15 weeks, the cord is the width of a piece of yarn.

Cord transection carries significant health risks to the patient, including blood loss, infection, and injury to the uterus.  Unlike a physician practicing in a hospital, a clinic physician does not have access to blood services for patients at risk of serious blood loss, nor does the physician have access to subspecialists such as anesthesiologists.

Umbilical-cord transection is not a feasible method for fetal demise as it is essentially an experimental procedure that carries no medical benefits to the woman.  The State argues that umbilical-cord transection is a safe method for fetal demise before the evacuation phase of the standard D&E based on one study, which is the only existing study that has examined umbilical-cord transection as a method for fetal demise before the evacuation phase of the standard D&E procedure.

The technical difficulties of performing umbilical-cord transection, the potential for serious harm, the lack of sufficient research on risks associated with the procedure, and the unavailability of training, indicate to the court that requiring umbilical-cord transection as a method of fetal demise

*in utero* would impose a substantial obstacle to a woman's right to terminate a pregnancy before viability of a fetus.

### VIII.  BALANCING BURDENS AND BENEFITS

To prevail, a plaintiff alleging a facial challenge to an abortion regulation must demonstrate that "in a large fraction of cases in which [the law] is relevant, it will operate as a substantial obstacle to a woman's choice to undergo an abortion." *Casey*, 505 U.S. at 895.  In the large-fraction test, the court uses as the denominator those cases "in which the provision at issue is relevant," which is a narrower class than "pregnant women" or "the class of women seeking abortions." *Whole Woman's Health*, 136 S.Ct. at 2320 (citing *Casey*, 505 U.S. at 894-95).  As the Act affects every second trimester D&E abortion procedure in Texas, the class of women here consists of all women in Texas who are 15 to 20 weeks pregnant and seek an outpatient second-trimester D&E abortion.

The State argues that the Act is an appropriate use of its state regulatory power to bar certain medical procedures and substitute others, all in furtherance of its legitimate interest in regulating the medical profession in order to promote respect for the unborn life.  The State maintains that its interests are sufficiently strong to justify the burdens the Act imposes on a woman seeking a second-trimester abortion because, even under the Act, the pregnant woman retains the ability to terminate the pregnancy at or after 14 weeks.

The State's argument is premised on it being feasible for all Texas abortion providers to utilize one of the three fetal-demise methods.  The court finds that none of the proposed fetal-demise methods is feasible for any physician other than a specialist in maternal-fetal medicine, without substantial additional training, to induce fetal demise *in utero* in all instances before performing the evacuation phase of a standard D&E procedure.  Three abortion providers testified that they would

stop performing second-trimester abortions if required to always ensure *in utero* fetal demise before performing the evacuation phase of a standard D&E abortion. It is unknown how many other abortion providers would choose to not undergo the additional training and cease performing abortions.

Ensuring fetal demise before evacuation is a significant change in the way a standard D&E abortion has been historically performed. Although the State presented some evidence to the contrary, the evidence substantially supports that a careful physician will not proceed with the D&E procedure until 24 hours after injecting digoxin to cause fetal demise. The delay is to be certain that fetal demise has occurred before evacuation. Standing alone, this additional delay constitutes an undue burden, but that burden is increased by Texas law requiring a 24-hour delay in the abortion process after the woman undergoes a sonogram and is counseled. If the Act alone does not create an undue burden, its interaction with other Texas law pushes the previability-abortion burden on a woman seeking a second-trimester abortion above the undue threshold.

The court finds that under the Act, all women seeking a second-trimester abortion at 15 weeks would have to endure a medically unnecessary and invasive procedure that increases the duration of what otherwise is a one-day standard D&E procedure. The Act further subjects those women to additional risks of complications. The court finds that these women would be in a unique position: the court is unaware of any other medical context that requires a doctor–in contravention of the doctor's medical judgment and the best interest of the patient–to conduct a medical procedure that delivers no benefit to the woman. For most women, the Act increases the length of the procedure from one day to two, not including the mandatory first visit for a sonogram and counseling, before attempting fetal demise, thereby increasing all accompanying costs of perhaps travel, lodging,

time away from work, and child care. This delay and extra cost would be particularly burdensome for low-income women, many of whom must wait to seek a second-trimester abortion, because of the time required to obtain the funding to cover the costs of the abortion.

The court concludes that requiring a woman to undergo an unwanted, risky, invasive, and experimental procedure in exchange for exercising her right to choose an abortion, substantially burdens that right. The court concludes that the Act fails to "confer[] benefits sufficient to justify the burdens upon access [to abortion] that [the Act] imposes." *Whole Woman's Health*, 136 S.Ct. at 2299. Indeed, the court finds the Act's burdens, by definition, exceed its benefits, those burdens are undue, and the obstacles they embody are, by definition, substantial. *Id.* at 2300, 2309-10, 2312, 2318. Additionally, the court concludes that whether the court weighs the asserted state interests against the effects of the provisions or examines only the effects of the provisions, Plaintiffs have carried their burden of demonstrating that the Act creates an undue burden for a large fraction of women for whom the Act is a substantial rather than an irrelevant restriction. The record includes sufficient evidence from Plaintiffs of causation that the Act's requirements will lead to this effect. *See id.* at 2313. The court concludes the Act is an inappropriate use of the State's regulatory power over the medical profession to bar certain medical procedures and substitute others in furtherance of the State's legitimate interest in regulating the medical profession in order to promote respect for the life of the unborn. The State's valid interest in promoting respect for the life of the unborn, although legitimate, is not sufficient to justify such a substantial obstacle to the constitutionally protected right of a woman to terminate a pregnancy before fetal viability.

## IX. CONCLUSION

In resolving the issues presented by this case, the court has been guided by existing Supreme Court precedent and influenced by the contemporaneously developing opinions of the several courts who have considered legislation similar to the Act. Words are important. That a woman may make the decision to have an abortion before a fetus may survive outside her womb is solely and exclusively the woman's decision. The power to make this decision is her right. The State's legitimate concern with the preservation of the life of the fetus is an interest having its primary application once the fetus is capable of living outside the womb. The court must weigh the right against the interest. The State's position is that the right and the interest are entitled to equal weight. But this is incorrect. That the right is dominant over the interest is self-evident. The right is absolute and the interest is given only marginal consideration before fetal viability. The Act dictates fetal demise at a time before fetal viability. The Act establishes a point of fetal demise before fetal viability. In so doing, the Act does not further the health of the woman before the fetus is viable.

It is the nature of parties to a dispute to examine precedent and select language that appears to support an individual party's position in the dispute. It is the function of the court to examine the language on which each party relies to support its position. The court must determine the overall effect of the precedent where, as here, the parties direct the court to the same precedent. The court must be mindful not to allow discrete statements in a precedential court's opinion to consume the holding of the precedent. This court concludes that *Stenberg* and *Gonzales* lead inescapably to the conclusion that the State's legitimate interest in fetal life does not allow the imposition of an additional medical procedure on the standard D&E abortion–a procedure not driven by medical necessity. Here the State's interest must give way to the woman's right. The Act does more than

26

create a structural mechanism by which the State expresses profound respect for the unborn. The Act intervenes in the medical process of abortion prior to viability in an unduly burdensome manner.

The court concludes that the determinations in *Stenberg* and *Gonzales* that the standard D&E abortion procedure, unencumbered by any requirement of *in utero* fetal demise before a physician performs the evacuation phase of the abortion, is a safe alternative abortion procedure to the banned D&X or partial-birth abortion procedure. The court further concludes that although the Act advances a valid state interest, the Act "has the effect of placing a substantial obstacle in the path of a woman's choice, [and therefore] cannot be considered a permissible means of serving its legitimate ends." *Casey*, 505 U.S. at 877. The court concludes that the Act is facially unconstitutional. Accordingly, the court will declare the Act void and permanently enjoin Defendants from enforcing the Act.

SIGNED this *22nd* day of November, 2017.

LEE YEAKEL
UNITED STATES DISTRICT JUDGE